1 | Daniel C. Girard (State Bar No. 114826)
dcg@girardgibbs.com
2 | Jonathan K. Levine (State Bar No. 220289)
jkl@girardgibbs.com
3 | Todd I. Espinosa (State Bar No. 209591)
tie@girardgibbs.com
4 | **GIRARD GIBBS LLP**
601 California Street, 14th Floor
5 | San Francisco, California 94108
Telephone: (415) 981-4800
6 | Facsimile: (415) 981-4846

7 | Plaintiffs' Co-Lead Counsel

8 | [Additional counsel appear on signature page]

**FILED**

2010 JAN 29 PM 3: 50

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY: ____

9
10
11
12

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

**BY FAX**

13 | JANA MCCOY, HENRY MITCHELL,
14 | JEFF HUBER, ALVIN SABROFF, JUNE
SABROFF, JAMES MERRILL,
15 | CHERYL MERRILL and DON
RIBACCHI, on behalf of themselves and
16 | all others similarly situated,

Plaintiffs,

17

v.

18
19 | CULLUM & BURKS SECURITIES,
INC., CAPWEST SECURITIES, INC.,
20 | SECURITIES AMERICA, INC.,
AMERIPRISE FINANCIAL, INC.,
21 | SECURITIES AMERICA FINANCIAL
CORP., NATIONAL SECURITIES
22 | CORP., NATIONAL HOLDINGS
CORP., CAPITAL FINANCIAL
23 | SERVICES, INC. and CAPITAL
FINANCIAL HOLDINGS, INC.,

24 | Defendants.

25 | This document relates to:
26 | Case No. 8:09-CV-01084-DOC-RNB
Case No. 8:09-CV-01295-DOC-RNB
27 | Case No. 8:09-CV-01340-DOC-MLG
Case No. 8:09-CV-08482-DOC-RNB
28

Case No. 8:09-CV-01084-DOC-RNB

**CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT
FOR VIOLATIONS OF SECTIONS
12 AND 15 OF THE SECURITIES
ACT OF 1933**

**DEMAND FOR JURY TRIAL**

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiffs Jana McCoy, Henry Mitchell, Jeff Huber, Alvin and June Sabroff, James and Cheryl Merrill, and Don Ribacchi (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned counsel, make the following allegations on information and belief based upon the investigation of counsel, except as to the allegations pertaining specifically to Plaintiffs, which are based on personal knowledge.

The investigation conducted by Plaintiffs' counsel included, among other things, a review and analysis of: (i) publicly available news articles and reports concerning the events giving rise to this litigation; (ii) the Securities and Exchange Commission's ("SEC") First Amended Complaint, dated November 9, 2009 (the "SEC Complaint") against Medical Capital Holdings, Inc. ("MCHI") and related entities and individuals; (iii) the reports filed by Thomas A. Seaman, the court-appointed receiver for MCHI and its related entities (the "Receiver's Reports"); (iv) the Administrative Complaint filed by the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts, dated January 26, 2010, against Defendant Securities America, Inc.; (v) documents publicly filed by MCHI and certain affiliates with the SEC; (vi) the Class Action Complaint against Wells Fargo Bank, NA and the Bank of New York Mellon Corporation, dated November 2, 2009; (vii) offering documents, sales materials and communications issued and disseminated by Medical Capital (defined below) and Defendants (defined below); and (viii) discussions with potential class members and other potential witnesses.

## I.    NATURE OF THE ACTION

1.    This is a consolidated securities class action brought under Sections 12(a) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77l(a) and 77o, on behalf of all persons or entities who purchased or otherwise acquired promissory notes (the "Notes") issued by certain of MCHI's special purpose corporations ("SPCs") - Medical Provider Financial Corporation III ("MP III"), Medical Provider Financial Corporation IV ("MP IV"), Medical Provider

- 1 -

Funding Corporation V ("MP V"), and/or Medical Provider Funding Corporation VI ("MP VI") from Defendants Cullum & Burks Securities, Inc. ("Cullum & Burks"), Securities America, Inc. ("Securities America"), CapWest Securities, Inc. ("CapWest"), National Securities Corporation ("National Securities") and/or Capital Financial Services, Inc. ("Capital Financial") (collectively, the "Broker Defendants"), or any of their affiliates, and suffered damages (the "Class").

2.    Plaintiffs specifically disclaim any allegations of fraud in connection with these Securities Act claims.

3.    MCHI purported to be in the business of financing healthcare providers by purchasing their accounts receivables and making secured loans to them.

4.    In September 2003, just two months after a subsidiary aborted an attempted public offering, MCHI began a series of overlapping integrated unregistered offerings of the Notes, which continued until July 2009.  These offerings (the "Offerings") were for the stated purpose of funding MCHI's medical provider financing operations.  MCHI raised the funds by selling Notes issued by the SPCs which were created allegedly to hold the receivables and related assets.

5.    Medical Capital Corporation ("MCC"), a wholly-owned subsidiary of MCHI, served as the administrator for the SPCs, which included Medical Provider Financial Corporation I ("MP I"), Medical Provider Financial Corporation II ("MP II"), MP III, MP IV, MP V and MP VI.  For the purposes of this complaint, "Medical Capital" refers to MCHI, MCMI, MCC and the SPCs, unless otherwise indicated.

6.    The Notes were offered and sold pursuant to private placement memoranda ("PPMs") - purportedly only to "accredited investors" - through a national network of broker-dealers that included the Broker Defendants.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

7.     The Offerings occurred without the filing of any registration statement, and no registration statement pertaining to the Offerings was otherwise in effect.

8.     The Notes were offered and sold in a public manner on a nationwide basis by at least 60 brokerage firms to more than 20,000 investors, more than 35 of whom were not accredited and many of whom lacked the knowledge and sophistication required to invest in the Notes or other unregistered securities.

9.     The PPMs contained untrue statements of material fact and omissions of material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.  The untrue statements and omissions concerned, among other things, Medical Capital's accounting deficiencies and failures, use of investor proceeds for improper investments, lack of internal controls, misuse of investor proceeds, inflated and unreliable collateral valuations and defaults.

10.     On July 16, 2009, the public learned that Medical Capital and two of its senior executives, CEO Sidney M. Field and President and COO Joseph J. Lampariello, had misappropriated and wrongfully used hundreds of millions of dollars of investor funds raised in the Offerings.

11.     Plaintiffs and the Class bring this action: (1) pursuant to Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77l(a)(1), against the Broker Defendants for the offer and sale of unregistered securities;  (2) pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against the Broker Defendants with respect to the offer and sale of the Notes; and (3) under Section 15 of the Securities Act, 15 U.S.C. § 77o, against Defendants Ameriprise Financial, Inc. ("Ameriprise"), Securities America Financial Corporation ("Securities America Financial"), National Holdings Corporation ("National Holdings") and Capital Financial Holdings, Inc. ("Capital Financial Holdings") (collectively, the "Control

- 3 -

Person Defendants") in their capacity as control persons of certain of the Broker Defendants.

**II.    JURISDICTION AND VENUE**

12.    The claims asserted herein arise under and pursuant to Sections 12(a)(1), 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77l(a)(1), 77l(a)(2) and 77o.

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act, 15 U.S.C. § 77v.

14.    Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, because certain of the transactions, acts, practices, and courses of business occurred within this District.

**III.   PARTIES AND RELEVANT ENTITIES**

**A.    PLAINTIFFS**

15.    Plaintiff Jana McCoy purchased MP VI Notes offered and sold to her by Defendant Cullum & Burks in September 2008, and suffered damages.  Prior to the time of Ms. McCoy's purchase of MP VI Notes, a violation of Section 5 of the Securities Act had occurred.

16.    Plaintiff Henry Mitchell purchased MP V Notes offered and sold to him by Defendant Securities America in December 2007 and July 2008, and suffered damages. Prior to the time of Mr. Mitchell's purchases of MP V Notes, a violation of Section 5 of the Securities Act had occurred.

17.    Plaintiff Jeff Huber purchased MP V Notes offered and sold to him by Defendant CapWest in December 2007, January 2008 and February 2008, and suffered damages.  Prior to the time of Mr. Huber's purchases of MP V Notes, a violation of Section 5 of the Securities Act had occurred.

18.    Plaintiffs Alvin and June Sabroff purchased MP IV Notes offered and sold to them by Defendant Securities America in July 2007, and suffered damages.

Prior to the time of the Sabroffs' purchase of MP IV Notes, a violation of Section 5 of the Securities Act had occurred.

19.    Plaintiffs James and Cheryl Merrill purchased MP V and MP VI Notes offered and sold to them by Defendant National Securities in February, March and September 2008, and suffered damages. Prior to the time of the Merrills' purchases of MP V and MP VI Notes, a violation of Section 5 of the Securities Act had occurred.

20.    Plaintiff Don Ribacchi purchased MP III, MP IV and MP V Notes offered and sold to him by Defendant Capital Financial between November 2006 and May 2008, and suffered damages. Prior to the time of Mr. Ribacchi's purchases of MP III, MP IV and MP V Notes, a violation of Section 5 of the Securities Act had occurred.

**B.    DEFENDANTS**

21.    Defendant Cullum & Burks is a full-service broker-dealer with a national network of representatives, offering a range of investment products and services. Cullum & Burks is an SEC-registered investment advisor and broker-dealer registered with both the SEC and the Financial Industry Regulatory Authority ("FINRA"). The company was founded in 1999. Cullum & Burks is headquartered in Dallas, Texas, and maintains a sales office in Newport Beach, California.

22.    Defendant CapWest is a full service brokerage firm with a national network of representatives, offering a range of investment products and services. The company is headquartered in Lakewood, Colorado, and maintains offices in California.

23.    Defendant Securities America is a Delaware corporation with its principal place of business in La Vista, Nebraska and offices in California. Securities America is one of the nation's largest independent broker-dealers, registered both with the SEC and FINRA. The advisory division of Securities

America, Securities America Advisors, Inc., was founded in 1993 and is an SEC
registered investment advisor with over $13 billion in assets under management.
On January 26, 2010, the Securities Division of the Office of the Secretary of the
Commonwealth of Massachusetts filed an administrative complaint against
Securities America for violating the Massachusetts Securities Act in connection
with its offer and sale of the Notes to Massachusetts residents.

24.   Defendant Ameriprise is a Delaware corporation with its principal
place of business in Minneapolis, Minnesota and offices in California.  Ameriprise
offers financial planning products and services to individual and institutional
investors, primarily in the United States.  Through Ameriprise Financial Services
and other affiliates, Ameriprise sells insurance, mutual funds, college savings
plans, personal trust services, retail brokerage, and other products and services.
Ameriprise distributes its products mainly through a network of financial advisors
that includes direct employees, franchisees, affiliates, and its broker-dealer
subsidiary, Defendant Securities America.   According to Securities America's
report on file with FINRA, Ameriprise wholly-owns Securities America's parent
company (Defendant Securities America Financial), is an indirect owner of
Securities America, and "direct[s] the management or policies" of Securities
America.

25.   Defendant Securities America Financial is a Nebraska corporation
with a principal place of business in Omaha, Nebraska. According to Securities
America's report on file with FINRA, Securities America Financial is a holding
company and "Direct Owner" of defendant Securities America, owns at least 75
percent of Securities America, and "direct[s] the management or policies" of
Securities America.  Additionally, several Securities America Financial officers
serve as officers of Securities America, including Steven F. McWhorter, who
serves as Securities America Financial's Chairman, CEO and President, and as
Securities America's Chairman and CEO; and James Delwyn Nagengast, who

- 6 -
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1  serves as Securities America Financial's COO, CFO, and Treasurer, and Securities
2  America's COO and CFO.

3      26.    Defendant National Securities is a Washington corporation with its
4  principal places of business in New York, New York and Seattle, Washington and
5  with offices throughout California. National Securities is one of the nation's
6  largest independent broker-dealer, registered both with the SEC and FINRA.
7  National Securities is a wholly-owned and controlled subsidiary of Defendant
8  National Holdings.

9      27.    Defendant National Holdings is a Delaware corporation with its
10  principal place of business in New York, New York. National Holdings is a
11  holding company that operates primarily through wholly-owned subsidiary
12  National Securities and two other broker-dealer subsidiaries, vFinance
13  Investments, Inc. and EquityStation, Inc. Through its broker-dealer subsidiaries,
14  National Holdings offers full service brokerage services, trades and makes a
15  market in securities, and provides investment banking services to clients. Through
16  other subsidiaries, National Holdings also provides asset management services and
17  insurance products.

18      28.    Defendant Capital Financial is a North Dakota corporation with its
19  principal places of business in Minot, North Dakota and with offices in California.
20  Capital Financial is an independent broker-dealer and investment advisor,
21  registered both with the SEC and FINRA. Capital Financial is a wholly-owned
22  and controlled subsidiary of Defendant Capital Financial Holdings.

23      29.    Defendant Capital Financial Holdings is a North Dakota corporation
24  with its principal place of business in Minot, North Dakota. Capital Financial
25  Holdings is a holding company that operates primarily through wholly-owned
26  subsidiary Capital Financial and its family of mutual funds. Through Capital
27  Financial, Capital Financial Holdings distributes securities and insurance products
28  to retail investors. Through its mutual fund services, Capital Financial Holdings

- 7 -

1  provides investment advisory, distribution, shareholder services and fund
2  accounting for Capital Financial Holdings' mutual funds.
3  **C.    RELEVANT NON-PARTIES**
4      30.    MCHI is a Nevada corporation with its principal place of business in
5  Tustin, California.  Through various wholly-owned subsidiaries and SPCs, MCHI
6  was to provide financing to healthcare providers within the United States by
7  purchasing their accounts receivable and making secured loans to them. MCHI was
8  to fund its healthcare financing operations through the sale of the Notes in the
9  Offerings.
10      31.    MCMI is a Delaware corporation with its principal place of business
11  in Las Vegas, Nevada.  It is a wholly-owned subsidiary of MCHI that was formed
12  on August 4, 2000 for the primary purpose of acquiring healthcare receivables.
13      32.    MCC is a Nevada corporation that is a wholly-owned subsidiary of
14  MCHI, with its principal place of business in Tustin, California.  MCC served as
15  the administrator for each of MCHI's SPCs, including MP I – VI.  MCC provided
16  management, underwriting, and administrative services to the SPCs, such as
17  bookkeeping, payroll, and accounting services, including administration of all
18  investor notes and interest payments.
19      33.    Medical Tracking Services, Inc. ("MTSI") is a Nevada corporation
20  and wholly-owned subsidiary of MCHI, with its principal place of business in Las
21  Vegas, Nevada.  MTSI acted as the servicer for all of the SPCs' accounts
22  receivable transaction data.  MTSI monitored, tracked and posted asset purchases
23  and collections.  MTSI facilitated the tracking of healthcare receivables since 1997.
24      34.    Sidney M. Field was at all relevant times the CEO and a director of
25  MCHI and its subsidiaries.  Field resides in Villa Park, California.
26      35.    Joseph J. Lampariello was at all relevant times the President, COO
27  and a director of MCHI and its subsidiaries.  Lampariello resides in Newport
28  Beach, California and Huntington Station, New York.

36.     MP I is a Nevada corporation, formed in September 2003, and is a wholly-owned SPC and subsidiary of MCHI. From December 2003 to August 2007, MP I conducted an Offering, raising approximately $554.9 million through the issuance of about 3,821 notes to investors. As of May 31, 2009, MP I had repaid all but $375,000 of its investors' principal.

37.     MP II is a Nevada corporation, formed in October 2003, and is a wholly-owned SPC and subsidiary of MCHI. From January 2004 to December 2005, MP II conducted two Offerings (Series I and II), raising approximately $251.7 million through the issuance of about 3,458 Notes. As of May 27, 2009, MP II had approximately $88 million in Notes outstanding, and had defaulted in paying $43 million in principal and $1.3 million in interest to investors.

38.     MP III is a Nevada corporation, formed in February 2005, and is a wholly-owned SPC and subsidiary of MCHI. From July 2005 to January 2008, MP III conducted two Offerings (Series I and II), raising approximately $522.7 million by issuing 5,318 notes. As of March 31, 2009, MP III had approximately $109.4 million in Notes outstanding, and as of May 27, 2009 had defaulted in paying principal on $26.5 million in outstanding Notes.

39.     MP IV is a Nevada corporation, formed in July 2005, and is a wholly-owned SPC and subsidiary of MCHI. From November 2006 to February 2008, MP IV conducted two Offerings (Series I and II) raising approximately $401.3 million by issuing 4,222 Notes. As of May 27, 2009, MP IV had $400 million in Notes outstanding, and had defaulted in paying interest payments in January 2009 and since March 2009.

40.     MP V is a Nevada corporation, formed in September 2007, and is a wholly-owned SPC and subsidiary of MCHI. From November 2007 to July 2008, MP V conducted an Offering, raising approximately $401.8 million by issuing 4,323 Notes. These Notes begin to mature in November 2009, and MP V has defaulted on payments to investors.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

41.    MP VI is a Nevada corporation, formed in April 2008, and is a wholly-owned SPC and subsidiary of MCHI. From August 2008 to July 2009, MP VI conducted an Offering and, as of June 2009, it raised approximately $76.9 million through the issuance of Notes to approximately 700 investors. MP VI has defaulted on payments to investors.

42.    The Court's August 3, 2009 order in the SEC enforcement action has stayed all litigation against the relevant non-parties identified in ¶¶ 30-41. Accordingly, this complaint does not assert claims against any of them.

## IV.    FACTUAL ALLEGATIONS

### A.    Medical Capital

43.    Prior to the issuance of the Notes in the Offerings, MCHI's wholly-owned subsidiary MCMI attempted to issue notes to the general public in a registered public offering.

44.    In December 2002, MCMI filed a preliminary registration statement and prospectus with the SEC in which it proposed to issue up to $100 million in notes to the public.

45.    According to the preliminary registration statement and prospectus, the notes would be priced at $1,000 per note and would be offered in several classes, each with a different maturity and different annual interest rate. The note proceeds would be used primarily to purchase healthcare receivables. The notes would be secured by the assets purchased with the note proceeds, which would be monitored by a bank acting as the trustee.

46.    MCMI filed amendments to the registration statement and prospectus in January and February 2003.

47.    In May 2003, MCMI notified the SEC that it was unable to timely comply with its reporting requirements because of its inability to file audited financial statements.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

48.   In July 2003, MCMI withdrew the filed registration statement and prospectus, without selling any of the securities.

49.   In September 2003, MCHI began conducting the Offerings through the SPCs.

50.   In the Offerings, the Notes were priced at $1,000 per note and were offered in several classes, each with a different maturity and different annual interest rate. The Note proceeds were to be used primarily to purchase healthcare receivables. The Notes were to be secured by the assets purchased with the Note proceeds, which were to be monitored by a bank acting as the trustee.

51.   These overlapping Offerings, which were purportedly exempt from registration under the Securities Act pursuant to Rule 506 of Regulation D, raised a total of approximately $2.2 billion from over 20,000 investors throughout the United States.

52.   MCC was the Administrator for each SPC pursuant to an Administrative Service Agreement. MCC administered each SPC's day-to-day operations, underwriting and originating purchases of healthcare receivables and performing marketing, sales and client support functions. MCC was to be paid fees for these services from amounts collected from healthcare receivables.

53.   MTSI provided data entry of receivables and receivable payments for the SPCs. When the SPCs received batches of receivables under receivables purchase agreements, claim information was provided to MTSI. As receivables payments came in from insurance companies, MTSI would enter data on the payments into the tracking programs. MTSI would generate and provide reports to MCC and the SPC on receivable collections. MTSI was paid fees for these services.

**B.   The SEC Action and Receivership of the Medical Capital Entities**

54.   Beginning in August 2008, MP III through MP VI began to default on their obligations to make payments of interest and/or principal to Note holders.

55.     The Broker Defendants and other broker-dealers continued to offer and sell the Notes and represent that Medical Capital had never defaulted on any of the Notes.

56.     On July 16, 2009, the SEC commenced an enforcement action against MCHI, MCC, MP VI, Field and Lampariello for securities violations.

57.     Also on July 16, 2009, the SEC sought, among other things, the appointment of a receiver over MCHI, MCC, the SPCs and their subsidiaries and affiliates.

58.     On July 20, 2009, the Court appointed Thomas A. Seaman as receiver (the "Receiver") and entered an order for certain injunctive relief (the "TRO").

59.     On July 21, 2009, the Court vacated the TRO, and ordered the submission of additional briefing and evidence by the parties to the action.

60.     On August 3, 2009, the Court entered the TRO, again appointing Mr. Seaman as Receiver.

61.     On August 12, the Receiver submitted his First Report to the Court.

62.     On August 14, 2009, the Receiver submitted his Amended First Report to the Court (the "Receiver's First Report").

63.     The Receiver's First Report sets forth improper and/or other wrongful practices that Medical Capital committed in connection with its operations, assets and financial condition.  Among other things, the Receiver's First Report describes in detail how Medical Capital engaged in accounting violations, improperly used investor proceeds, and inflated collateral valuations, among other things.

64.     The Receiver's subsequent Second, Third, Fourth, Fifth and Sixth Reports and the SEC Complaint provide additional detail about the scope of the improper and wrongful practices at Medical Capital.

65.     According to the Receiver's Reports and the SEC Complaint: (1) five of the six SPCs (MP II-MP VI) have been in default or late in paying principal and/or interest on $992.5 million in Notes since August 2008; (2) Medical Capital

- 12 -

and its executives misappropriated more than $300 million of investor funds through the improper payment of purported administrative fees; (3) MP II-MP VI were never profitable and resulted in substantial cash outflows from each SPC and losses totaling in excess of $316 million; (4) $617 million of the $625 million of accounts receivables on the books of the SPCs at the time the Receiver assumed control of Medical Capital either no longer existed or were too old to be collectible; and (5) loans and other assets with a claimed value of almost $1 billion were transferred between and among the SPCs for the purpose of paying improper administrative fees and paying earlier investors from new investors' funds.

C.    The Offerings and Solicitation of Investors

66.    The Notes were offered and sold to the public through a nationwide network of more than 60 broker-dealers, including the Broker Defendants, pursuant to PPMs, in a series of integrated Offerings as unregistered private placements exempt from the registration requirements of the Securities Act under Rule 506 of Regulation D.

67.    The multiple Offerings constituted one single integrated offering pursuant to Rule 502 of Regulation D, 17 C.F.R. § 230.501-508. Specifically, the Offerings were part of a single plan of financing, involved the issuance of the same class of securities, were made at or about the same time, involved the same type of consideration received, and were for the same general purposes.

68.    Each of the Offerings was structured and conducted in a similar manner.

69.    The Offerings included general solicitations of investors through, among other things, advertisements in newspapers, mailings of postcards that solicited potential investors to attend meetings, and sales pitches delivered at seminars, meetings and dinners to which attendees were invited without regard or inquiry as to the investors' sophistication or knowledge as investors, or as to whether they were "accredited investors."

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

70.  For example, in the Sarasota, Florida area, at least six dinner meetings were held for the MP III, MP IV and MP V offerings. These meetings were jointly conducted by a Broker Defendant and a representative of Medical Capital. The meetings were open to interested investors who were encouraged to bring friends and other potential investors. About 25 potential investors attended each meeting. There was no effort made prior to or at the meetings to limit attendance only to accredited investors. At the meetings, the Broker Defendant made a brief introduction and a Medical Capital representative made a PowerPoint presentation about the company and the benefits of investing in the Notes. The presentation highlighted the guaranteed nature of the investment returns, the role of the trustee banks to collect, hold and release funds, that the assets were 100% collateralized, and that Medical Capital only invested in class A receivables. Attendees could obtain written marketing materials and copies of the PPM for the Notes that were the subject of the meeting.

71.  In the Dallas/Fort Worth, Texas area, potential investors were solicited through newspaper advertisements highlighting the potential returns investors would receive from an investment in Medical Capital Notes. Investors who responded to the newspaper advertisements were invited to lunch and dinner meetings attended by the broker-dealer and a Medical Capital representative, who would make a presentation similar to that described in the preceding paragraph. There was no effort made prior to or at these meetings to limit attendance only to accredited investors. More than 50 potential investors attended each meeting.

72.  In the Boston, Massachusetts area, dinner seminars to provide information about the Medical Capital Offerings were conducted at least yearly by one of the Broker Defendants. Each seminar was attended by 80 to 100 potential investors, some of whom had no prior relationship with the Broker Defendant. There was no effort made prior to or at the seminars to limit attendance only to

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

accredited investors, and all attendees could pick up and take home copies of the PPMs, regardless of whether they were accredited.

73.    In the Los Angeles, California area, one of the Broker Defendants mailed postcards to potential investors with whom it had no prior relationship or dealings. The postcards solicited individuals to attend dinner meetings. These meetings, which were attended by approximately 25-50 attendees, included a presentation on a variety of investments, including Medical Capital. Interested investors were asked for their names and telephone numbers. Shortly after the meetings, investors were contacted by the Broker Defendant asking the individual to invest in Medical Capital.

74.    Written materials describing an investment in the Notes were disseminated and made available to the general public on the internet, including "Program Highlights" touting the Notes. The program highlights were essentially the same as the PowerPoint presentations used by Medical Capital and the broker-dealers during the seminars, meetings and dinners that were conducted to solicit sales of the Notes.

75.    As a result of this nationwide sales effort by Medical Capital and the more than 60 broker-dealers selling the Notes, including the Broker Defendants, more than 20,000 investors from all over the United States purchased more than $2.2 billion of the Notes.

76.    As a consequence of the use of these and other marketing techniques by Medical Capital, the Broker Defendants and other broker-dealers, more than 35 Medical Capital investors were not accredited investors. Many of the investors lacked the knowledge and sophistication to assess the investment in the Notes or lacked access to the type of information that registration of the Notes would disclose.

77.    Many of the investors who were offered and/or sold the Notes had no prior relationship with a Broker Defendant or the other broker-dealers.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

78.    Unaccredited investors who purchased Notes in the Offerings did not receive, or did not receive in a reasonable time prior to the sale of such Notes, the information required to be furnished pursuant to Rule 502 of Regulation D, 17 C.F.R. § 230.502(b)(2).

79.    Defendants Securities America, CapWest Securities, National Securities and Capital Financial all offered and/or sold Notes to unaccredited investors.

80.    Other broker-dealers that also offered and/or sold Notes to unaccredited investors include, among others, USA Capital, ATP Financial Services, Jackson McClenny Investments, Bank of the James, Western Financial Partners, Western Financial Advisors, Korhorn Financial and Valmark Securities.

**D.    The PPMs**

81.    The Broker Defendants were retained by Medical Capital to offer and sell the Notes in the Offerings on a best effort basis, and they received sales commissions based on the aggregate principal amount of the Notes sold in the Offerings.

82.    The Broker Defendants offered and sold Notes in the Offerings to investors, including to Plaintiffs and the Class.

83.    The PPMs for the Offerings provided by the Broker Defendants to Plaintiffs and the Class were substantially similar in all material respects.

84.    The PPMs described the SPCs as special purpose subsidiaries of MCHI created primarily to purchase, hold and collect healthcare receivables and other assets related to the healthcare industry.

85.    The PPMs described, among other things, the business operations of the Medical Capital entities, the underwriting criteria for receivables, the receivables acquisition process, the administration and servicing of the Notes and related assets, and the manner the SPC would use investor proceeds raised from investors in the Offerings.

86.     In a section entitled "Restriction on Use of Proceeds," the PPMs
stated that investor proceeds raised in the Offerings would not be used to pay
administrative fees to MCC or service fees to MTSI.   Specifically, the PPMs
stated:

> We will not use any proceeds from the sales of notes to pay
> administrative fees to Medical Capital Corporation for the services it
> provides as administrator or to pay servicing fees to [MTSI] as the
> services of the receivables.  The fees relating to these services are
> contained in the administrative services agreement and the master
> servicer agreement and are paid out of amounts collected from the
> healthcare receivables.

87.     The PPMs stated that the Notes would be secured by assets consisting
of healthcare accounts receivable proceeds, other rights and assets related to the
healthcare industry and other assets pledged or other cash held (the "Collateral")
which would be pledged to a trustee for the benefit of the Note holders (the
"Trustee").

88.     The PPMs described the manner in which the Collateral was to be
preserved and maintained by the Trustee.  Specifically, the PPMs set a specific net
collateral coverage ratio (the "NCCR") that was required to be calculated and
"reported to the trustee monthly."  The PPMs described circumstances under which
it was an event of default under the pertinent Note agreement if the NCCR was less
than 100%.  The PPMs also stated that administrative fees would be paid to MCC
only if the NCCR remained at 100% after the payment of all other required
payments.

**E.     Material Misstatements and Omissions in the PPMs**

89.     The PPMs contained untrue statements of material fact and omitted
material facts necessary in order to make the statements, in light of the
circumstances under which they were made, not misleading.

90.     As set forth below, the PPMs misstated and failed to disclose Medical

Capital's accounting deficiencies and failures, use of investor proceeds for improper investments, the lack of internal controls, the use of investor proceeds for improper "administrative fees" and inflated and unreliable collateral valuations.

### 1.    Medical Capital's Accounting Irregularities and Failures

91.    The SEC Complaint and Receiver's Reports identify Medical Capital's accounting irregularities and failures.

92.    Medical Capital did not keep the SPCs' financial statements in accordance with generally accepted accounting principles ("GAAP"), and failed to maintain accounting records in a manner such that GAAP-compliant financial statements could be generated. At the time an SPC purchased a batch of receivables, Medical Capital recorded as revenue the amount that expected collections exceeded the purchase price, but did not reconcile actual collections with expected collections.

93.    The PPMs failed to disclose that Medical Capital's accounting records did not comply with GAAP and that Medical Capital did not keep its records in a GAAP compliant manner.

94.    Medical Capital engaged in "round-tripping," which is the practice of selling an asset of one related entity to another repeatedly. According to the Receiver's Reports, MCC's records indicate that accounts receivables were transferred from older SPCs to newer SPCs at least 301 times, amounting to over $829 million in sales of assets from one SPC to another.

95.    The PPMs failed to disclose that Medical Capital engaged in "round-tripping."

96.    According to the Receiver's Reports, certain receivables purchased by SPCs did not exist at the time of the purchase.

97.    The PPMs failed to disclose that the SPCs "purchased" non-existent receivables.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

98.    According to the Receiver's Reports, Medical Capital commingled funds between entities and overpaid for assets.

99.    The PPMs failed to disclose that Medical Capital commingled funds between entities and overpaid for assets.

100.    According to the Receiver's Reports, a number of assets listed as medical receivables in the MCC collateral reports do not appear to be medical receivables. For example, in the June 30, 2009 collateral report for MP VI, MCC included an entry for a company named "Trace" in the amount of $15.8 million as a medical receivable asset. The monies provided to Trace were in the form of an acquisition loan and a letter of credit. Trace apparently has been nonoperational since approximately September 2008, and most likely could not have generated any receivables, much less medical receivables. Additionally, in the same June 30, 2009 MP VI collateral report, there is an entry by MCC for "EMark" in the amount of $17.2 million as a medical receivable asset. As stated below, EMark is an internet advertising company which does not provide any medical services.

101.    The PPMs failed to disclose that Medical Capital mischaracterized non-medical collateral as medical receivables.

102.    According to the Receiver's Reports, internal MCC documents indicate a significantly lower value for a number of assets than was stated in the collateral reports to the Trustees.

103.    The collateral reports were provided to the Trustees, and provided the information on which the amounts of MCC's administrative fees were based.

104.    The PPMs failed to disclose that Medical Capital's collateral reports overstated assets and resulted in improper payments of administrative fees to MCC.

## 2.    Use of Investor Proceeds for Improper Investments

105.    According to the SEC Complaint and Receiver's Reports, Medical Capital improperly made a number of undisclosed investments unrelated to the

- 19 -

healthcare field, including:

        a.     A $6.9 million investment in Vivavision, Inc. – whose primary business is marketing content for mobile phone applications;

        b.     An investment in Single Touch Initiative, another company that provided mobile phone applications, for about $5.4 million;

        c.     An investment in EMark Advertising Inc., an internet advertising company for $17.2 million that purportedly specialized in "pornographic website advertising";

        d.     Ownership of a 118-foot yacht, called "Home Stretch," moored in Newport Beach, California, which purportedly was used by Lampariello and other Medical Capital executives for private parties; and

        e.     A $20 million investment in an unknown, unreleased film, "The Perfect Game."

      106.   The PPMs failed to disclose that Medical Capital used investor proceeds to make the improper investments listed in ¶ 105 above.

      **3.**    **Misuse of Investor Proceeds**

      107.   According to the SEC Complaint and Receiver's Reports, Medical Capital misappropriated and wrongfully used investor funds to pay MCC administrative fees.  For example, the MP VI Supplemental PPM stated that:

> As of February 28, 2009, we have issued notes in the face amount of $69,331,558.90.  We have used $65,558,703.02 of the proceeds to finance accounts receivable.  We have applied $3,264,410.12 to commissions and other expenses.  The balance is on deposit in our trust account awaiting additional accounts receivable financing.

      108.   According to the SEC Complaint, as of February 28, 2009, MP VI did not spend $65.5 million on accounts receivables, but only approximately $48.8 million.  MP VI did not pay approximately $3.3 million in "commissions and other expenses" but rather, paid $21.7 million in administrative fees, which exceeded MP VI's collections by $16.9 million.  MCHI and MCC took, as administrative

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

fees, approximately 24% of the amount raised in the MP VI offering.

109.   The PPMs misrepresented the use of investor proceeds obtained through the Offerings.

110.   The statement in the PPMs with respect to "Restriction on Use of Proceeds," set forth in ¶ 86 above, was an untrue statement of material fact.

111.   The PPMs failed to disclose that Medical Capital overstated the amount of investor proceeds used to purchase accounts receivable and understated the amounts of investor proceeds use to pay commissions, other expenses and administrative fees.

### 4. Inflated and Unreliable Collateral Valuations

112.   The SEC Complaint and Receiver's Reports describe inflated and unreliable collateral valuations in Medical Capital collateral reports.

113.   For example, a collateral report for MP IV had an asset listed as related to the "Legacy Medical Center" in Georgia valued at $40 million. The facility in question was foreclosed and non-operational.

114.   Because administrative fees paid to MCC were based on the NCCR reported in the collateral reports, and because the collateral reports contained inflated and unreliable collateral valuations of Medical Capital assets, the administrative fees paid to MCC were improper.

115.   According to the Receiver's Reports, MCC collected administrative fees in the following amounts: for MP II, $55,659,000; for MP III, $48,650,000; for MP IV $56,565,000; for MP V, $48,030,000; and for MP VI, $24,615,000.

116.   The PPMs failed to disclose that Medical Capital collateral reports would include inflated and unreliable collateral valuations.

117.   The PPMs failed to disclose that administrative fees were improperly paid to MCC based on inflated collateral values and incorrectly calculated NCCRs.

### 5. SPCs in Default

118.   In August 2008 – the same month that the MP VI Offering began –

the defaults began:  MP II defaulted on $43 million in principal payments and $1.3 million in interest payments; MP III defaulted on $26.5 million in principal payments; MP IV missed interest payments in January 2009 and from March 2009. Also, according to the SEC Complaint, MP V made late interest payments.

119.    The Receiver's Reports indicate that "as a result [of the defaults], it appears that noteholders will almost certainly suffer significant losses on their investments."

120.    The MP VI PPM stated that "[MP VI's] affiliates have never defaulted in the payment of their obligations on these debt securities, and all interest payments on those securities were made when due."

121.    The statement in MP VI PPM, set forth in ¶ 120 above, is an untrue statement of material fact because, at the time of the MP VI offering, MPs II, III, IV and V had each defaulted on their obligations.

### 6.    Lack of Internal Controls

122.    The PPMs failed to disclose that Medical Capital lacked sufficient internal controls to ensure that the violations and conduct alleged in ¶¶ 91-121 would not occur.

## V.    CLASS ACTION ALLEGATIONS

123.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Medical Capital Notes issued by MP III, MP IV, MP V and/or MP VI offered and sold to them by any of the Broker Defendants, or their affiliates, and were damaged. Excluded from the Class are Defendants and the Relevant Non-Parties identified above, their officers and/or directors, any person, firm trust corporation, officer, director or other individual or entity in which any Defendant or Relevant Non-Party has a controlling interest or which is related to or affiliated with any of the Defendants or Relevant Non-Parties, and the legal representatives, agents,

1   affiliates, heir, successor-in-interest or assigns of any such excluded party.

2       124.   The Class satisfies the requirements of Rule 23(a) and 23(b)(3) of the

3   Federal Rules of Civil Procedure including numerosity, typicality, commonality,

4   superiority and adequacy.

5       125.   The members of the Class are so numerous that joinder of all

6   members would be impracticable.

7       126.   Plaintiffs believe that over 20,000 investors purchased the Notes, and

8   the names and addresses of the Class members can be ascertained from the books

9   and records of Medical Capital or Defendants.

10      127.   Plaintiffs will fairly and adequately represent and protect the interests

11  of the Class members.  Plaintiffs have retained competent counsel experienced in

12  class action litigation to further ensure such protection and to prosecute this action

13  vigorously.  Plaintiffs have no interests that are contrary to, or in conflict with,

14  those of the members of the Class that Plaintiffs seek to represent.

15      128.   Plaintiffs' claims are typical of the claims of the other Class members

16  because Plaintiffs' and the Class' claims arise from the same conduct.

17      129.   A class action is superior to other available methods for the fair and

18  efficient adjudication of this controversy.  Since the damages suffered by

19  individual Class members may be relatively small, the expense and burden of

20  individual litigation make it virtually impossible for the Class members to seek

21  redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will

22  be encountered in the management of this litigation that would preclude its

23  maintenance as a class action.

24      130.   Common questions of law and fact exist as to all Class members and

25  predominate over any questions affecting solely individual Class members.

26  Among the questions of law and fact common to the Class are whether:

27          a.    Defendants violated Sections 12(a)(1), 12(a)(2) and/or 15 of the

28  Securities Act, as alleged herein;

b.    the Notes were offered in violation of the registration requirements of the Securities Act;

c.    each PPM constitutes a "prospectus" for the purposes of Plaintiffs' claims under the Securities Act;

d.    the PPMs contain misstatements of material fact or omit to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

e.    the Broker Defendants offered, disseminated or sold the Notes in the Offerings;

f.    the Control Person Defendants controlled certain of the Broker Defendants; and

g.    the members of the Class have sustained damages and, if so, the appropriate measure thereof.

## COUNT I

### Violations of Section 12(a)(1) of the Securities Act
### Against The Broker Defendants

131.    Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein, except the allegations in ¶¶ 9, 63-65, 89-122.

132.    Plaintiffs bring this cause of action for violation of Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77l(a)(1), on behalf of themselves and the Class against the Broker Defendants.

133.    This claim is asserted on behalf of Plaintiffs and Class members who purchased or otherwise acquired the Notes of MP III, MP IV, MP V and/or MP VI from any of the Broker Defendants or their affiliates.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

134.   The Broker Defendants and their affiliates were sellers, offerors and/or solicitors of sales of the Notes issued in connection with the Offerings within the meaning of the Securities Act.

135.   The Broker Defendants and their affiliates used means and instrumentalities of interstate commerce and the United States mail.

136.   The Notes were offered and sold to investors in violation of the registration requirements of Section 5 of the Securities Act, 15 U.S.C. § 77e.

137.   By virtue of the conduct alleged herein, the Broker Defendants violated Section 12(a)(1) of the Securities Act, 15 U.S.C § 77l(a)(1).

138.   Accordingly, Plaintiffs and other members of the Class have the right to rescind and recover the consideration paid for the Notes, together with interest thereon, and elect to rescind and tender their securities to the Broker Defendants. Plaintiffs and the members of the Class who have sold their Notes for less than their stated principal value are entitled to damages.

139.   This claim is timely because it is brought within one year after Plaintiffs and Class members discovered or reasonably could have discovered the violations upon which it is based, and no more than three years after the Notes were *bona fide* offered to the public.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act
### Against the Broker Defendants

140.   Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.

141.   Plaintiffs bring this cause of action for violation of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of themselves and the Class against the Broker Defendants.

142.   This claim is asserted on behalf of Plaintiffs and Class members who purchased or otherwise acquired the Notes of MP III, MP IV, MP V and/or MP VI

- 25 -

on or after September 18, 2006 from any of the Broker Defendants or their affiliates.

143.    The PPMs constituted a prospectus within the meaning of Section 12 of the Securities Act.

144.    The Broker Defendants and their affiliates were sellers, offerors and/or solicitors of sales of the Notes issued in connection with the Offerings within the meaning of the Securities Act.

145.    The Broker Defendants and their affiliates used means and instrumentalities of interstate commerce and the United States mail.

146.    The PPMs contained untrue statements of material fact and omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

147.    As alleged herein, the untrue statements of material fact and omissions of material fact concerned among other things, Medical Capital's accounting deficiencies and failures, use of investor proceeds for improper investments, lack of internal controls, misuse of investor proceeds, inflated and unreliable collateral valuations, and defaults.

148.    Plaintiffs and other Class members purchased the Notes, not knowing of the untrue statements of material fact and omissions of fact in the PPMs alleged herein.

149.    By virtue of the conduct alleged herein, the Broker Defendants violated Section 12(a)(2) of the Securities Act, 15 U.S.C § 77l(a)(2), and Plaintiffs and members of the Class have been damaged.

150.    Plaintiffs and other members of the Class have the right to rescind and recover the consideration paid for the Notes, together with interest thereon, and elect to rescind and tender their securities to the Broker Defendants. Plaintiffs and the members of the Class who have sold their Notes for less than their stated principal value are entitled to damages.

- 26 -

151. This claim is timely because it is brought within one year after the discovery of the untrue statements or omissions, or after such discovery should have been made by the exercise of reasonable diligence, and no more than three years has elapsed since Plaintiffs and Class members purchased or otherwise acquired the Notes.

## COUNT III

### Violations of Section 15 of the Securities Act
### Against the Control Person Defendants

152. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.

153. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Control Person Defendants.

154. The Control Person Defendants are owners and control persons of certain of the Broker Defendants. Defendants Ameriprise and Securities America Financial had the power to influence and control and actively used this influence and control over Defendant Securities America. Defendant National Holdings had the power to influence and control and actively used this influence and control over Defendant National Financial Corp. Defendant Capital Financial Holdings had the power to influence and control and actively used this influence and control over Defendant Capital Financial.

155. This claim is timely because the underlying violations alleged herein are timely.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on their own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Plaintiffs as representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as counsel for the Class;

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

B.     Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct in an amount to be proven at trial;

C.     Awarding Plaintiffs and the Class rescission or a rescissionary measure of damages;

D.     Awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

E.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  January 29, 2010                Respectfully submitted,

**GIRARD GIBBS LLP**

By:  _____

Daniel C. Girard
Jonathan K. Levine
Todd I. Espinosa
601 California Street, 14th Floor
San Francisco, California 94108
(415) 981-4800

Plaintiffs' Co-Lead Counsel

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**ZWERLING, SCHACHTER & ZWERLING, LLP**

Robin F. Zwerling
Stephen L. Brodsky
Stephanie E. Kirwan
41 Madison Avenue
New York, New York 10010
Telephone: (212) 223-3900
Facsimile: (212) 371-5969

- and -

Dan Drachler
1904 Third Avenue, Suite 1030
Seattle, Washington 98101
(206) 223-2053

Plaintiffs' Co-Lead Counsel

**KOHRMAN JACKSON & KRANTZ, PLL**

Ari H. Jaffe
One Cleveland Center, 20th Floor
1375 East Ninth Street
Cleveland, OH 44114
Telephone: (216) 696-8700
Facsimile: (216) 621-6536

Plaintiffs' Counsel

- 29 -

## CERTIFICATE OF SERVICE

I, Anne von Goetz, hereby declare as follows:

I am employed by Girard Gibbs, A Limited Liability Partnership, 601 California Street, 14th Floor, San Francisco, California 94108. I am over the age of eighteen years and am not a party to this action. On January 29, 2010, I served the following documents:

    1)    **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 12 AND 15 OF THE SECURITIES ACT OF 1933**

on:

### *ATTACHED SERVICE LIST*

__X__ by placing the document listed above for collection for mailing to the firms marked for *Via First Class Mail* on the attached service list following the firm's ordinary business practice in a sealed envelope with postage thereon fully prepaid for deposit in the United States mail at San Francisco, California addressed as set forth below.

_____ by personally delivering the document(s) listed above to the person(s) set forth below on this date.

__XX__ by electronically transmitting via email the above listed document to the email addresses set forth on the attached service list on this date.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct, executed January 29, 2010, at San Francisco, California.

Anne von Goetz

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**SERVICE LIST**

| | |
|---|---|
| Dan Drachler<br>**ZWERLING SCHACHTER AND ZWERLING**<br>1904 Third Avenue, Suite 1030<br>Seattle , WA 98101<br>206-223-2053<br>Fax: 206-343-9636<br>Email: ddrachler@zsz.com<br><br>*Plaintiffs' Co-Lead Counsel*<br><br>**Served Via Email** | Robin F Zwerling<br>Stephen Brodsky<br>**ZWERLING SCHACHTER & ZWERLING**<br>767 3rd Ave<br>New York , NY 10017-2023<br>212-223-3900<br>Email: rzwerling@zsz.com<br><br>*Plaintiffs' Co-Lead Counsel*<br><br>**Served Via Email** |
| Ari H. Jaffe<br>**KOHRMAN JACKSON & KRANTZ, PLL**<br>One Cleveland Center, 20th Floor<br>1375 East Ninth Street<br>Cleveland, OH 44114<br>Email: ahj@kjk.com<br><br>*Plaintiff s' Counsel*<br><br>**Served Via Email** | Julia Rider<br>**JEFFER MANNGELS BUTLER & MARMARO LLP**<br>1900 Avenue of the Starts, 7th Floor<br>Los Angeles, California 90067<br>Email: jjr@jmbm.com<br><br>*Counsel for Defendant Cullum & Burks Securities Inc.*<br><br>**Served Via Email** |
| Mike Margolis<br>Timothy J. Martin<br>**MARGOLIS & TISMAN LLP**<br>444 South Flower St., Suite 2300<br>Los Angeles, CA 90071<br>Email: margolis@winlaw.com<br>Email: tmartin@winlaw.com<br><br>*Counsel for Defendants Securities America Inc., Ameriprise Financial Inc., and Securities America Financial Corporation*<br>**Served Via Email** | Gregory J. Sherwin<br>**FIELDS FEHN & SHERWIN**<br>11755 Wilshire Blvd., 15th Floor<br>Los Angeles, CA 90025<br>Email: gregsherwin@ffandslaw.com<br><br>*Counsel for Defendant CapWest Securities Inc.*<br><br>**Served Via Email** |

- 31 -

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

| | |
|---|---|
| Delaware Corporate Services Inc.<br>2711 Centerville Road<br>Wilmington, DE 19801<br><br>*Registered Agent for Defendant*<br>*National Holding Corporation*<br><br><br>***Served Via First Class Mail*** | National Securities Corporation<br>1001 4th Avenue, Suite 220<br>Seattle, WA 98101<br><br>*Registered Agent for Defendant*<br>*National Securities Corporation*<br><br><br>***Served Via First Class Mail*** |
| Christine Dusbabek<br>**CORPORATE LEGAL, LLC**<br>6041 S. Syracuse Way, Suite 305<br>Greenwood Village, CO 80111<br>Email: cdusbabek@corporatelegal.us<br><br>*Counsel for Defendants Capital*<br>*Financial Services, Inc., and Capital*<br>*Financial Holdings, Inc,*<br><br>***Served Via Email*** | Bruce M. Bettigole<br>Deborah G. Heilizer<br>**SUTHERLAND ASBILL &**<br>**BRENNAN LLP**<br>1275 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>Email:<br>bruce.bettigole@sutherland.com<br>Email: deb.heilizer@sutherland.com<br><br>*Counsel for Defendants Securities*<br>*America Financial Corp., Securities*<br>*America Inc., and Ameriprise*<br>*Financial Inc.*<br><br>***Served Via Email*** |
| Peter Ligh<br>**SUTHERLAND ASBILL &**<br>**BRENNAN LLP**<br>Grace Building<br>1114 Avenue of the Americas, 40th<br>Floor<br>New York, New York 10036-7703<br>Email: peter.ligh@sutherland.com<br><br><br>*Counsel for Defendants Securities*<br>*America Financial Corp., Securities*<br>*America Inc., and Ameriprise*<br>*Financial Inc.*<br>***Served Via Email*** | |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT